**Mrs. Lois B. NEVELS, Plaintiff-Appellee,**

v.

**FORD MOTOR COMPANY,
Defendant-Appellant.**

**No. 29105.**

United States Court of Appeals,
Fifth Circuit.

Feb. 25, 1971.

Rehearing Denied March 24, 1971.

Ingraham, Circuit Judge, did not participate in consideration or decision of case.

Edmund A. Landau, Jr., James V. Davis, Landau, Davis & Farkas, Albany, Ga., for defendant-appellant.

Edward T. Hughes, Robert E. Hughes, Hughes & Hughes, Camilla, Ga., Hilliard P. Burt, Burt & Burt, D. D. Rentz, Albany, Ga., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and DYER and INGRAHAM, Circuit Judges.*

DYER, Circuit Judge:

Jimmy Nevels was killed when the Mustang automobile in which he was a passenger went off the road and was demolished. Jimmy's mother, Mrs. Lois B. Nevels, claiming that the accident and her son's death was caused by a defective steering mechanism installed in the automobile by the Ford Motor Company, recovered judgment against Ford for the value of the life of her unmarried son. Asserting that there was insufficient evidence to submit to the jury, that leave to amend its pleadings and leave to take the deposition of a witness was erroneously denied, that opposing counsel made an improper and prejudicial argument, and that there was error in giving and refusing to give certain charges, Ford appeals. We affirm.

On October 13, 1967, about 10:30 p. m., Julian Pollack was driving a 1967 Mustang automobile, owned by his brother-in-law Hurst, in a northerly direction on old U. S. Highway 19 between Pelham and Camilla, Georgia. There were three passengers in the car. Beth Harris occupied the right front seat, Nevels was in the rear seat behind Harris, and Shelda Hurst was seated to the left of him. The accident occurred at an S-curve about three miles south of Camilla. Viewed from the south, the road first curves to the left, then straightens out on a bridge, and finally curves to the right.

Approximately 125 to 150 feet north of the bridge, the Mustang went off the highway onto the left shoulder, then came back on the highway and travelled in a diagonal direction across the road, leaving a 100 foot skid or scuff mark on the surface. The Mustang again left the

---

* Judge Ingraham did not participate in the consideration or decision of this case.

highway and travelled 139 feet, striking three trees in succession during its journey. The car broke into three pieces. Pollack and Nevels were killed instantly. The two young ladies survived.

The wreckage was taken to a Chevrolet agency lot in Camilla, Georgia, where it was stored in the open until March 1, 1969. It was then taken to the rear of plaintiff's counsel's office, where it remained until trial. During this time witnesses for both parties examined the steering mechanism. Thus it is little wonder that the position of the steering wheel retaining nut was changed from time to time.

Plaintiff claimed that Ford was negligent in manufacturing or assembling the steering mechanism in that the steering wheel retaining nut was not properly torqued and was not secured with a sealing compound. This condition, it was argued, permitted slippage between the steering wheel hub and the steering wheel spline area, with consequent wear of the splines to the extent that steering became uncontrollable. Plaintiff also relied upon Ford's failure to give notice of this defect in accordance with the provisions of the National Traffic and Motor Vehicle Safety Act, 15 U.S.C.A. § 1402(a).

Each side produced five experts and two lay witnesses. Plaintiff called passenger Hurst, and defendant called passenger Harris and the state trooper who initially investigated the accident. The evidence, as might be expected, was in hopeless conflict concerning the speed of the Mustang prior to the accident and the condition of its steering mechanism, both of which were crucial factual issues.

Passenger Hurst and plaintiff's expert estimated the speed of the vehicle at 45 to 56 miles per hour. Passenger Harris, defendant's experts and the patrolman put the speed of the vehicle at approximately 100 miles per hour.

The experts were diametrically opposed concerning the condition of the splines and the retaining nut, as well as the cause of the conditions found. On the one hand, it was unequivocally stated that so long as the retaining nut was on the shaft, even in a loose condition, there could be no slippage of the shaft and no wear on the splines—that the splines showed no evidence of wear but showed only damage undoubtedly caused by the impact of the accident. On the other hand, it was stated, equally explicitly, that the splines showed considerable wear caused by the shaft slipping because the retaining nut was loose. This condition, it was said, made the steering virtually inoperable.

Prior to the accident Ford had received information that in "a few instances * * * steering wheels were reported to have become loose or disconnected in 1967 Mustangs manufactured at our Metuchen Assembly Plant between October, 1966 and January, 1967." Accordingly, it sent notices to each owner of such a car, including the purchaser and owner of the car here involved, Hurst (Pollack's brother-in-law),[1] to

1. The letter from Ford to each purchaser of a car manufactured at Metuchen said:

September 29, 1967

Dear Mustang Owner:

A recent review of service records has uncovered a few instances in which steering wheels were reported to have become loose or disconnected in 1967 Mustangs manufactured at our Metuchen Assembly Plant between October, 1966 and January, 1967. Because our records indicate that you are the owner of a Mustang manufactured at that plant during the same period, we are taking the precaution of arranging for your Ford dealer to inspect the steering wheel retaining nut in your Mustang.

Although there is very little likelihood that any looseness will be found in your steering wheel, it is very important that you have this inspection done promptly to avoid any possibility of a dangerous disconnection and consequent loss of steering control.

The enclosed notification form will advise your Ford dealer that your Mustang is one of those to be inspected, and that this work is to be performed at no charge to you. If you no longer live in the vicinity of the dealer who sold you your Mustang, or if you are other-

have the steering wheel retaining nut on his Mustang promptly inspected by the dealer at no cost, "to avoid any possibility of a dangerous disconnection and consequent loss of steering control." Every notice was sent to an address furnished to Ford by the dealer. Hurst's address proved incorrect; and by the time the correct address had been ascertained and the notice re-sent to and received by Hurst, the accident had occurred.

Ford's motions for a directed verdict, for judgment n. o. v., and for a new trial were denied. Ford complains that the plaintiff, relying on circumstantial evidence, did not carry her burden of proof that the Mustang left Ford's plant with the steering wheel retaining nut improperly secured and that Ford negligently failed to discover the defect by proper inspection.

In this diversity action, we are bound by Georgia law with respect to the measure of care owed by the manufacturer to a third person. The principle is succinctly stated in Griffith v. Chevrolet Motor Division, 1962, 105 Ga. App. 588, 125 S.E.2d 525, 527:

> As we view it, this case is controlled by Washburn Storage Co. v. General Motors Corp., 90 Ga.App. 380(3), 83 S.E.2d 26, where it was held: "a manufacturer who sells an article knowing that it is likely to be resold or used by other people than the buyer will be held liable for an injury to a stranger caused by a defect which might be discovered by reasonable inspections by the manufacturer." This, or course, is the rule laid down by Justice Cardozo in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, * * * which has been approved in a number of Georgia cases. E. g., Simmons Co. v. Hardin, 75

Ga.App. 420, 426, 43 S.E.2d 553; Moody v. Martin Motor Co., 76 Ga. App. 456, 461, 46 S.E.2d 197; Chrysler Corp. v. Rogers, 92 Ga.App. 109, 112, 88 S.E.2d 318. See, Restatement, Torts § 395; Blashfield, Cyclopedia of Automobile Law & Practice § 4812 (1950, Supp. 1961); Hilkey, Actions for Wrongful Death in Georgia (Pt. 5), 22 Ga.B.J. 325, 337 (n. 62) (1960); Annot., 78 A.L.R.2d 460, § 3.

Ford, while not contesting the correctness of the standard imposed upon it, urges that under Georgia law the plaintiff's circumstantial evidence was insufficient to take the case to the jury. But "[i]t is well settled in this Circuit that in diversity cases federal courts apply a federal rather than a state test for the sufficiency of evidence to create a jury question." Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365. The proper test is:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of

wise unable to return to him, please present the enclosed form to the Ford dealership nearest you and he will perform the necessary inspection.

We regret the necessity of having to ask you to take the time to have this inspection made but feel confident you will appreciate that we do so in the interest of your safety. We appreciate the confidence in our product that led you to buy a Mustang and we wish to do everything we can [to] retain that confidence.

Sincerely,
/s/ E. P. Williams
E. P. Williams

evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. *Id.* at 374–375.

■ We entertain no doubt that the evidence in this case sufficiently meets the *Boeing* test so as to require affirmance of the District Court's denial of Ford's motion for a directed verdict and judgment n. o. v. The jury could have fairly concluded from all of the evidence, though disputed, that Ford was negligent in not having tightened the wheel retaining nut by applying a proper torque on it, and in failing to properly secure the nut to the shaft by a sealer or an epoxy material. No error was committed in submitting the case to the jury. Indeed, it would have been error to do otherwise.

Ford next claims substantial prejudice in the refusal of the trial judge to permit it to take the deposition of an expert employed by the plaintiff. On September 12, 1969, in answers to interrogatories propounded by Ford, the plaintiff stated that Medsker was an expert, that he had been employed by the plaintiff, and that he had examined the scene of the accident. His address was noted as Atlanta, Georgia. On September 30, 1969, when Ford attempted to contact Medsker, his assistant informed Ford that Medsker was in Oakland, California, and was not expected to return to Atlanta until November 8, 1969. The trial of the case having been set for October 13, 1969, Ford, on October 1, 1969, gave notice to plaintiff that on October 8, 1969, it would take Medsker's deposition in California "to be used by defendant at the trial of the case." On October 7, 1969, plaintiff moved to stay the taking of Medsker's deposition because he was employed by the plaintiff as a reconstruction expert, and because the interval between the notice and the deposition was inadequate. On October 9, 1969, the court, although finding that there was reasonable notice of the taking of the deposition, granted the plaintiff's motion to stay. The District Judge stated "that the defendant cannot take the deposition of the plaintiff's reconstruction expert and thus receive the benefit of the paid expert of an opposite party."

■ We need not and do not reach the question of whether a deposition may be taken of an expert for *discovery* purposes. *See, e. g.*, Thornton v. State Highway Department, 1966, 113 Ga.App. 351, 148 S.E.2d 66; Fed.R.Civ.P. 26(b) (4); C. Wright and A. Miller, Federal Practice and Procedure §§ 2029–2034 (1970). Here the deposition was noticed for use at the trial. Medsker was absent from the court's jurisdiction and was not subject to subpoena. *See* Fed. R.Civ.P. 45(e) (1). Plaintiff made no attempt to produce the witness at trial. If indeed Medsker's evidence was relevant and material to the issues being tried, we can find no justification for barring his testimony as a witness at the trial even though he was retained as an expert by the opposite party. Considering this question in Logan v. Chatham County, 1966, 113 Ga.App. 491, 148 S.E. 2d 471, 473, the Georgia court of appeals said:

We see no valid reason why an independent real estate appraiser, who has knowledge of the facts pertaining to realty being condemned and who from that knowledge has applied his expertise and formed an opinion as to the value of the property, should not be subject to subpoena and offered as a wtiness by either party to the litigation, and that without regard as to which of the parties employed him to make the appraisal and paid his fee. The ultimate end of all litigation is

the ascertainment and rendition of the truth. The truth can be determined only through the sworn testimony of witnesses. Thus, any person not privileged having knowledge of issues being tried should be made available to the parties as witnesses. Neither a real estate appraiser nor his opinion is privileged. While it is certainly true that a real estate appraiser cannot be compelled to expend his time and knowledge in making an appraisal and forming an opinion as to value without remuneration for his efforts (Schofield v. Little, 2 Ga.App. 286, 58 S.E. 666), nevertheless once he has made the appraisal and formed an opinion he may be compelled to testify at the instance of either party.

While *Logan* is not controlling we believe that it correctly states the applicable principle. We thus disagree with the trial court's reason for refusing to permit Ford to take Medsker's deposition, but we are unconvinced that the error was harmful. The record is bare concerning Medsker's knowledge, or lack of knowledge, of the physical facts surrounding the accident. Likewise, there is no showing that he had formed, or was in a position to express an expert opinion either with respect to the steering mechanism or in regard to reconstructing the accident.[2] Furthermore, in view of the extensive testimony concerning spline damage given by Ford's witnesses, Burton, Schlegel and Hollman, and the detailed opinions concerning reconstruction given by the state trooper and defendant's experts, Roley and Dr. Tonn, anything that Medsker might have said would have been repetitious.[3] We conclude that the trial court's refusal to permit Ford to take Medsker's deposi-

tion, under the circumstances presented here, was harmless error.

On the morning of and just before the trial, Ford's counsel offered an amendment to its answer in which it sought to allege that Jimmy Nevels was negligent. Plaintiff objected that the hour was too late to inject a new issue into the case. The court, observing that it had held four conferences with counsel and a pretrial, at none of which this contention was made, denied leave to file the amendment. The District Judge concluded that the amendment had been offered too late, particularly since the sole reason for the untimely offer was that counsel had just found some new law.[4]

■ While it is generally true that leave to file amendments should be freely given, Fed.R.Civ.P. 15(a), amendments should be tendered no later than the time of pretrial, unless compelling reasons why this could not have been done are presented. In these times of log-jammed trial dockets, a trial judge must exercise sound discretion in deciding motions for leave to amend. His decision must weigh good cause shown for the delay in moving, *vis a vis* dilatoriness of counsel resulting in last minute surprise and inability of opposing counsel to meet the tendered issue. *See* Albee Homes, Inc. v. Lutman, 3 Cir. 1969, 406 F.2d 11, 14; Inland Container Corp. v. Atlantic Coast Line R. R., 5 Cir. 1959, 266 F.2d 857, 861; 3 J. Moore, Federal Practice §§ 15.08(4), 16.12 (2d ed. 1968). We are convinced that the trial judge did not abuse his discretion in this instance.

■ Although the amendment was not permitted, Ford complains that the court should have included in its charge

---

2. The answers to interrogatories disclose only that Medsker had examined the scene of the accident. Nothing was said about his expertise in reconstruction. No statement by Medsker was taken or proffered by Ford. Its counsel submitted an affidavit on information and belief which we do not credit.

3. Ford could not have made capital of the fact that Medskar had been employed by plaintiff. A party is not at liberty to ask

whether an expert witness was employed by the other party. Logan v. Chatham County, *supra*.

4. In colloquy, Ford's counsel informed the court that they would rely on Georgia Code § 68–1626(f), which provides, *inter alia*, that it is unlawful for a person to be a passenger in a motor vehicle engaged in a race upon the public highways.

the provision of Georgia Code Ann. § 68–1626(f) [5] to support Ford's contention that Jimmy Nevels was himself negligent. We need not tarry long here. The court properly refused the amendment. Moreover, no authority has been cited, and we can find none, for the assertion that violation of section 68–1626(f) constitutes negligence *per se*.

Ford insists that there was further error in the charge given by the court, at the plaintiff's request, that under 15 U.S.C.A. § 1402 a manufacturer must give notice of a defect in a car produced by it to the purchaser within a reasonable time after the manufacturer has discovered the defect if it relates to safety.[6] Ford argues that its obligation under this statute arises only when the manufacturer has actual knowledge of a defect existing in a particular automobile, in which event it must give notice to the particular owner. In any event, Ford contends that it discharged any duty that it had by sending the letter to Hurst, the owner of the Mustang.

■■■■ We reject, as did the District Court, Ford's contention that it must have reexamined the Mustang before it would have been required to give the owner notice of a steering defect. Such a construction of the statute would render it absurd and meaningless. The trial judge correctly interpreted the statute to mean that if Ford discovered in one car a defect common to automobiles manufactured by it, Ford then had a duty to notify other purchasers. The charge was properly given because the recall compaign to correct a possible defect in the steering mechanisms of Mustangs manufactured by Ford was alluded to by witnesses for both parties and was the subject of extended comment by counsel. The evidence was relevant not only with respect to the statutory duty of Ford, but also in regard to plaintiff's contention of negligent assembly in the manufacturing process. *See* Glynn Plymouth v. Davis, 1969, 120 Ga.App. 475, 170 S.E.2d 848, 852, aff'd, 1970, 226 Ga. 221, 173 S.E.2d 691. The court simply quoted the statute in its charge and left it to the jury to determine whether, under the circumstances, a notice was required, and if so whether Ford had complied by sending a proper notice. The contentions of the parties, when supported by the evidence, are matters which should be submitted to the jury under proper instructions. *See* Webster v. Sea Drilling Corp., 5 Cir. 1969, 411 F.2d 411, 413; Pasotex Pipe Line Co. v. Murray, 5 Cir. 1948, 168 F. 2d 661, 663.

■■■■ Finally, Ford seeks reversal because of the improper and prejudicial remarks of plaintiff's counsel in summation. In brief, counsel told the jury that it was a "crying shame" that the federal government "had to get on these industries up North." On Ford's objection the court properly instructed the jury to disregard counsel's statement. We seriously doubt that the tenor of plaintiff's argument had any impact on the jury, but any doubt about this was resolved by the court's instruction. It was within the trial court's discretion to instruct the jury to disregard the remarks rather than to declare a mistrial. We find no abuse of discretion. *See* Har-Pen Truck Lines, Inc. v. Mills, 5 Cir. 1969, 378 F.2d 705, 715; De Young v. Norwalk Truck Lines, Inc., 7 Cir. 1966, 362 F.2d 146, 148.

The judgment of the District Court is Affirmed.

---

5. *See* note 4 *supra*.

6. 15 U.S.C.A. 1402(a) provides:
Every manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser (where known to the manufacturer) of such motor vehicle or motor vehicle equipment, within a reasonable time after such manufacturer has discovered such defect.