[Civ. No. 37873. Second Dist., Div. Five. May 10, 1972.]

G. W. ANTHONY et al., Plaintiffs and Appellants, v.
KELSEY-HAYES COMPANY, Defendant and Respondent.

## Counsel

Stephen I. Zetterberg, Charles L. Zetterberg, Mark S. Kaiserman and Zetterberg & Zetterberg for Plaintiffs and Appellants.

Overton, Lyman & Prince, Carl J. Schuck and Brenton F. Goodrich for Defendant and Respondent.

## Opinion

AISO, J.—Plaintiffs G. W. Anthony and Herbert T. Lockerbie appeal from a judgment (order) of dismissal entered in favor of defendant Kelsey-Hayes Company, a corporation (Kelsey-Hayes), after its general demurrers (no cause of action stated) to the three counts of plaintiffs' first amended and supplemental complaint directed against it were sustained without leave to amend. (Code Civ. Proc., § 581, subd. 3.)

Plaintiffs are owners of Chevrolet three-quarter ton trucks. They instituted this action against defendants General Motors Corporation (General Motors) and Kelsey-Hayes, purportedly suing on behalf of themselves and all other owners of similar trucks sold by General Motors between 1960 and 1965, for damages allegedly suffered from defective wheels mounted on and sold as component parts of their trucks by General Motors. Kelsey-Hayes manufactured and sold these wheels to General Motors. The peculiarity of this suit is that plaintiffs do not aver for themselves any damages arising out of any personal injury or any physical damage to their vehicles attributable to the wheels claimed to have been defective. This appeal concerns only defendant Kelsey-Hayes.

General Motors sent out a letter dated May 28, 1969, (Exhibit "A")[1] calling attention of owners of 1964 (sic) Chevrolet three-quarter ton trucks to a serious safety risk on certain 15 x 5.50, three-piece disc wheels installed on trucks of this model if they were equipped with over-the-cab type campers, were overloaded, or operated with over-inflated tires. The risk is described as a sudden fracturing and breaking apart of the wheels, causing the tires to lose air suddenly and to separate from the wheel, with possible resultant loss of control of the vehicle. It advised the owners to consult a Chevrolet dealer and to purchase proper replacement wheels and, if necessary, tires and springs.

---

[1]Exhibits mentioned are those attached to the amended and supplemental complaint.

Plaintiffs filed their original complaint on August 12, 1969.

Thereafter, General Motors sent out a letter dated October 7, 1969, (Exhibit "B") referring 1965 (*sic*) Chevrolet three-quarter ton truck owners to the May 28, 1969, letter. It offered to replace all three-piece 15-inch wheels on three-quarter ton trucks with campers or special bodies at Chevrolet's expense. It advised those who had their wheels replaced subsequent to the May 28, 1969, letter to contact their Chevrolet dealer for adjustments on costs paid for such replacements. It offered to replace wheels, at Chevrolet's expense, in the event the owner or any subsequent owner of the truck should elect to attach a camper body or special body to such a truck.

In plaintiffs' amended and supplemental complaint, filed May 13, 1970, there is an averment that they had availed themselves of the offer in Exhibit "B" and that they now possess new wheels.

The three counts (causes of action) directed against Kelsey-Hayes consist of the third count based on negligence, the fourth upon strict liability, and the sixth on breach of implied warranty of fitness for use.

The compensatory damages sought are: (1) general depreciation in the value of the vehicles caused by General Motors' letter of May 28, 1969; (2) cost of inspections, repairs, and replacements; and (3) loss of use prior to and during inspections and repairs. Since plaintiffs have had new wheels installed at Chevrolet's cost, item (2) is no longer applicable to them.

The type of depreciation for which compensation is asked is one that has been characterized as within the category of loss of bargain. (See Prosser, Torts (4th ed. 1971) p. 666.) Because this type of loss differs with the terms of each purchase (or exchange in part payment of another vehicle) with the particular dealer, it is one more properly relegated to remedies available only to the immediate parties to the transaction (retailer and purchaser) in the absence of any express warranty running directly to the purchaser. (See Cumming, *Manufacturer's Responsibility for Defective Products* (1966) 54 Cal.L.Rev. 1681 et seq.; Uniform Com. Code, §§ 2313-2317.)

Loss of use is an item of incidental damage. It appears appropriate, therefore, to characterize it according to the nature of the damage of which it is an incident. Unless incidental to physical property damage, it would appear that it may be properly classified as a type of economic loss.

■ *Negligence:* In California, the only kinds of damages caused by

negligence which may be recovered from a defendant not in privity with plaintiff are for bodily injury and physical damage. (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18 [45 Cal.Rptr. 17, 403 P.2d 145]; *Wyatt* v. *Cadillac Motor Car Division* (1956) 145 Cal.App.2d 423, 426 [302 P.2d 665] and *Fentress* v. *Van Etta Motors* (1958) 157 Cal.App.2d Supp. 863, 866 [323 P.2d 227] [both disapproved on other grounds in *Sabella* v. *Wisler* (1963) 59 Cal.2d 21, 30 [27 Cal.Rptr. 689, 377 P.2d 889]]; see also *Trans World Airlines* v. *Curtiss-Wright Corp.* (1955) 1 Misc.2d 477, 481-482 [148 N.Y.S.2d 284, 290], affd. 2 App.Div.2d 666 [153 N.Y.S.2d 546, 550].) ■ The depreciation claimed here is not due to physical property damage. As for loss of use, it too does not flow from a compensable physical property damage. Here there is no claim for loss of profits based upon intended commercial use of the vehicles as in *Seely*. In fact only an indefinite possible loss flowing from a loss of use is pleaded. In actions sounding in negligence, the cause of action matures only when actual damage results from the negligent act. (*Fields* v. *Napa Milling Co.* (1958) 164 Cal.App.2d 442, 447-448 [330 P.2d 459, 68 A.L.R.2d 1052].) In actions bottomed on negligence, there is no recovery against a manufacturer for economic loss alone. (*Thomas* v. *Olin Mathieson Chem. Corp.* (1967) 255 Cal.App.2d 806, 810 [63 Cal.Rptr. 454].) Consequently, Kelsey-Hayes' demurrer upon the ground that no cause of action was stated was properly sustained against count three pleaded in terms of negligence.

■ *Strict liability:* In *Seely* v. *White Motor Co., supra,* 63 Cal.2d 9, 16-19, the court indicated that defects in the quality of goods (loss of bargain) and economic losses (loss of use of truck resulting in business loss) were not recoverable from the manufacturer under the theory of strict liability, but that these types of losses should be relegated to the law of contracts (sales) governing commercial transactions, i.e., to express and implied warranties.[2] We realize that the authorities in the various jurisdictions are not uniform in this regard (see Prosser, Torts (4th ed. 1971) *supra*, pp. 666, 667), but we feel constrained to be governed by the views set forth in the *Seely* majority opinion. The depreciation claimed by plaintiffs is definitely a complaint that the trucks with defective wheels were not of the quality bargained for. The loss of use in this case (as previously noted) is not specifically alleged even in terms of economic damage, but *Seely* indicates that even where the loss of use causes loss of profits, it is not recoverable from the manufacturer under the theory of strict liability. The general demurrer for failure to allege a cause of action was properly sustained to count four predicated upon strict liability.

---

[2]The theory has been further elucidated in Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 373.

Cases such as *Gherna* v. *Ford Motor Co.* (1966) 246 Cal.App.2d 639 [55 Cal.Rptr. 94], *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749], and *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607 [77 Cal.Rptr. 633], cited by plaintiffs, are distinguishable in that in those cases there was ponderable physical property damage to the property sold and purchased.

■ *Implied warranty:* It is settled law in California that privity between the parties is a necessary element to recovery on a breach of an implied warranty of fitness for the buyer's use, with exceptions not applicable here. (*Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682, 695-696 [268 P.2d 1041].) ■ A demurrer is properly sustainable in an action predicated upon a breach of an implied warranty when lack of privity between plaintiff and defendant is disclosed on the face of the complaint. (*Thomas* v. *Olin Mathieson Chem. Corp., supra,* 255 Cal.App.2d 806, 810.) ■ We conclude that the trial court properly sustained the demurrer to the sixth count, which was based upon this theory.

■ Plaintiffs contend that a class action exists and that the allegations of personal injury and property damage of *other* class members give rise to a cause of action for negligence, strict liability, and breach of implied warranty. As previously noted, however, plaintiffs do not allege that they themselves sustained any personal injuries or physical property damages. They cannot confer upon themselves standing to sue by purporting to represent a class of which they are not members. (*Cal. Gas Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 850 [330 P.2d 778].) They are not "similarly situated" to those who may have suffered such damages and therefore may not represent such a class. (*Greater Westchester Homeowners Assn., Inc.* v. *City of Los Angeles* (1970) 13 Cal. App.3d 523 [91 Cal.Rptr. 720].) *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864 [97 Cal.Rptr. 849, 489 P.2d 1113] is not of assistance to plaintiffs here because the benefits conferred or offered after plaintiffs filed their original complaint were "provided [or offered] to the [entire] class as a whole" (5 Cal.3d at p. 868).

The judgment (order) of dismissal is affirmed.

Kaus, P. J., concurred.

**STEPHENS, J.**—I dissent.

The size and financial stability of one of the codefendants in this action, General Motors, may lead to an unwarranted approach to the applicable

law. Kelsey-Hayes is but a shadow in comparison of ability to respond for liabilities. It is the exoneration of responsibility of the "little guy" that must here be considered when the "heavy" is still left in the case. The application of principles of law, however, must not vary just because of the size and ability to respond for accountability. Kelsey-Hayes is the manufacturer of the defective wheel; General Motors is the assembler of the "manufactured" and defective truck. The hub of this case centers on the wheel and involves the totality of the assembled truck only by way of General Motors' duty to itself refuse to assemble its trucks with known faulty parts. The monolith of General Motors must not affect the application of legal principles, for the establishment of an erroneous application of law could create authority which, were the assembler in fact or in financial condition a veritable fly-by-night and the part manufacturer a financially responsible entity, would restrict the injured party to his redress to the fly-by-night judgment unresponsive assembler. We therefore analyze the applicable principles with disregard for ability to respond to damages. The reality of the danger that I pose is vividly demonstrated by the fact that, in this case, the trial court sustained Kelsey-Hayes' demurrer on the ground that there was no privity between plaintiff and Kelsey-Hayes, but the trial court overruled General Motors' demurrer notwithstanding the fact that plaintiffs also lacked privity with General Motors.

In brief, plaintiffs have complained that, as the result of Kelsey-Hayes' wheels having been installed on their trucks, plaintiffs have suffered damages in an amount equivalent to the cost of replacing the defective wheels (hereinafter "replacement damages"), in an amount equivalent to the value of the loss of the use of their trucks prior to and during the time of replacement (hereinafter "loss of use damages"), and in an amount equivalent to the value of the depreciation caused by the publicized necessity for the replacement (hereinafter "depreciation damages").

In order to recover these alleged damages, plaintiffs rely upon the theories of implied warranty, negligence, and products liability.

The majority has held that plaintiffs have failed to state a cause of action in implied warranty, and I agree. "The general rule is that privity of contract is required in an action for breach of . . . implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." (*Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 695 [268 P.2d 1041].)

The majority has also held, however, that plaintiffs' alleged damages are mere economic losses, and, as a consequence, plaintiffs have failed to state a cause of action either in products liability, or, for want of privity, in

negligence. I disagree with the majority's conclusion that plaintiffs' alleged damages are mere economic losses.[1] I also note that the holding by the majority would preclude a cause of action in negligence against General Motors.

Much of the early development of the law of products liability was based upon the warranty theory. (*Henningsen* v. *Bloomfield Motors, Inc.,* 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1].) Warranty, however, suffered from the defect that it was "a freak hybrid born of the illicit intercourse of tort and contract, [and although warranty] had always been recognized as bearing to some extent the aspects of a tort . . . [,] '[w]arranty' had become so closely identified to the legal profession with a contract between the plaintiff and the defendant, that it was attended by contract rules." (Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn.L.Rev. 791, 800-801.) Because of the limitations that contract law imposed upon products liability, California adopted the position that products liability did not lie in warranty, but, instead, lay in tort. (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) "The effect of [California's] decision was immediate. Other courts at once agreed that the proper theory was not one of warranty at all, but simply of strict liability in tort divorced from any contract rules. [Fn. omitted.]" (Prosser, *The Fall of the Citadel (Strict Liability to the Consumer), supra,* at p. 804.) Because of the evolution from warranty to tort, the law of contract suffered " 'some violent pounding and twisting,' . . . (Patterson, *The Apportionment of Business Risks Through Legal Devices,* 24 Colum.L.Rev. 335, 358; see also Prosser, *supra,* 69 Yale L.J. 1099, 1124-1134)" (*Seely* v. *White Motor Co.,* 63 Cal.2d 9, 15 [45 Cal.Rptr. 17, 403 P.2d 145]), and many of the traditional distinctions between contract and tort became blurred. In *Seely,* then Chief Justice Traynor, for six members of the court, attempted to reestablish the judicial dominions of contract, and in order to accomplish this, focus was placed upon the types of harms that each (contract and tort) should compensate: "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss . . . rests . . . on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the

---

[1] Plaintiffs' alleged damages for replacements and loss of use are distinct from the alleged depreciation damages, and the two are treated separately herein.

consumer's demands. *A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market.* He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will."[2] (*Id.*, at p. 18; see also Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn.L.Rev. 363, 373.)

The rule thus announced in *Seely* may best be expressed in two statements of Chief Justice Traynor: "[T]he manufacturer's strict liability in tort is limited to physical injury caused by a defective product" (Traynor, *supra*, 32 Tenn.L.Rev. 363, 373), and the "rules [of warranty] determine the *quality of the product* the manufacturer promises and thereby determine the quality [economic expectations] he must deliver" (*Seely, supra,* at p. 16). Although the distinction between physical injury and economic loss has been the subject of many California legal commentators (Prosser, Handbook of The Law of Torts (4th ed.) pp. 665-667; Prosser, *supra,* 50 Minn.L.Rev. 791, 820-823; Cumming, *Manufacturer's Responsibility for Defective Products: Continuing Controversy Over the Law to be Applied,* 54 Cal.L.Rev. 1681; Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases,* 18 Stan.L.Rev. 974, 980-983; Davis, *Products Liability: What Type of Loss Will the Doctrine of Strict Liability in Tort Cover?,* 17 Hastings L.J. 385; Traynor, *supra,* 32 Tenn.L.Rev. 363, 373), the best explanation of these concepts lies in an examination of the facts of the *Seely* case itself.

In *Seely,* the purchaser had entered into a conditional sales contract with a retail truck dealer for the purchase of a truck to be used "in his business of heavy-duty hauling." (*Id.,* at p. 12.) After taking possession of the truck, the purchaser discovered that the truck "bounced violently, an action known as 'galloping.'" (*Id.,* at p. 12.) The retailer, with guidance from the manufacturer's representatives, was unable to correct the galloping. Thereafter, the truck overturned, and the purchaser brought an action against the retailer and the manufacturer for "(1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck." (*Id.,* at p. 13.) During the trial, the plaintiff dismissed his action as against the retailer. Subsequently, the trial court found that "plaintiff *had not proved* that the galloping caused the accident

---

[2]Emphasis has been added in certain quotations throughout this opinion and will not be separately noted.

*and therefore denied his claim* [against the manufacturer] for . . . repair of the truck." *(Id.,* at p. 13.) The trial court did find, however, that the manufacturer had breached its express warranty to the purchaser, and, as a consequence, was liable to the purchaser in the amount of the money paid on the purchase price and in the amount of the purchaser's lost profits.

The California Supreme Court, in the majority opinion, concurred with the trial court holding that the purchaser *had not proved* that the galloping caused "the physical damage to the truck" *(Id.,* at p. 19), and that, *as a consequence,* the trial court was correct in denying the purchaser his *damages for repairs.* The majority also agreed that the manufacturer had breached its express warranty to the purchaser, and that the warranty provided for the return of money paid on the purchase price as well as the lost profits; the majority added, however, that in the absence of warranty, these disappointments in economic expectations would not otherwise have been compensable in either products liability, or in the absence of privity, in negligence.

Nowhere in *Seely,* however, was it suggested that the truck was other than in the condition that the manufacturer had intended. The purchaser's losses were the result of the truck's failure to meet the purchaser's specific "business needs" *(Id.,* at p. 16) of "heavy-duty hauling" *(Id.,* at p. 12). "[T]he truck plaintiff purchased did not function properly *in his business."* *(Id.,* at p. 16.) The truck did function properly though when it was subsequently sold to "an experienced trucker" *(Id.,* at p. 16) who thereafter drove the truck "82,000 miles [without] unusual difficulty with it" *(id.,* at pp. 16-17). "Thus, it is more likely that the truck functioned normally when put to use in [the subsequent purchaser's] business because his use made demands upon it different from those made by plaintiff's use." *(Id.,* at p. 17.) Plaintiff's losses were not the result of the truck's failure to function properly, but were the result of the truck's failure to function properly under the demands of *his business,* and the manufacturer "cannot be held for the level of performance of his products in the *consumer's business* [economic expectations] unless he agrees that the product was designed to meet the consumer's demands." *(Id.,* at p. 18.) "If under these circumstances [the manufacturer were] strictly liable in tort for the *commercial loss* suffered by plaintiff, then it would be liable for business losses of other truckers caused by the failure of its trucks to meet the *specific needs* of their business, even though those needs were communicated only to the dealer." *(Id.,* at p. 17.) "The manufacturer would be liable for damages of unknown and unlimited scope." *(Id.,* at p. 17.)

The allegations in the case before us, however, do not present the situa-

tion of a product's meeting certain legitimate needs but failing to meet other certain idiosyncratic needs. Plaintiffs have alleged that the wheels have "latent microscopical metallurgical defects, including some known as 'cold shuts' and some stress raisers known as 'laps,' " that cause the wheels to be "inherently dangerous" when the trucks are put to all normal and expected use,[3] and the fact of the first General Motors recall letter is at least some evidence that General Motors agrees[4] (Witke, *The Automobile Recall or "Campaign" Letter,* 38 Ins. Counsel J. 608; see also *Nevels* v. *Ford Motor Co.,* 439 F.2d 251, 258.)

The *Seely* rationale of distinguishing economic loss from property damage is that the manufacturer should not be held "for the level of performance of his products . . . unless he agrees that the product was designed to meet the consumer's demands" (*id.,* at p. 18), for, otherwise, the "manufacturer would be liable for damages of unknown and unlimited scope" (*id.,* at p. 17). An application of this rationale to the case before us forces the conclusion that plaintiffs are not alleging solely economic losses, but, instead are alleging *actual property damage* as the result of the constructive destruction of their wheels; imposing liability for wheels that fail to meet legitimate truck needs does not hold the manufacturer "for a level of performance of his products [that it has not agreed] that the product was designed to meet" (*id.,* at p. 18), nor does it expose the manufacturer to liability "for damages of unknown and unlimited scope" (*id.,* at p. 17).

In addition, I believe that the majority has overlooked the fact that plaintiffs have alleged physical damage to property other than to the wheels themselves. In their complaint, plaintiffs "contend that they are entitled to complete repairs including the cost of *tires* of sufficient size and capacity to fit replacement wheels. . . ." In addition, I believe that

---

[3]Although the original recall letter warned only of the use of campers and other "overloading," plaintiffs rely upon the following public statement of General Motors for support of their allegation that the wheels cannot be considered to be safe for any legitimate truck purpose: "[W]heel failure is a fatigue matter [and] the entire load/time history is essential to an analysis of fatigue failures. . . ."

[4]We recognize that General Motors' decision to "recall" the trucks was not entirely voluntary. Under compulsion of the National Traffic and Motor Vehicle Safety Act of 1966 (15 U.S.C. §§ 1381 et seq., 1402 (e)), "[e]very manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser . . . of such motor vehicle or motor vehicle equipment, within a reasonable time after such manufacturer has discovered such defect." (15 U.S.C. § 1402 (a); see also *General Motors Corporation* v. *Volpe,* 321 F.Supp. 1112 [where General Motors attempted, unsuccessfully, to enjoin the enforcement of this act in regard to the defective wheels which have given rise to the very action now before us].)

judicial notice may be taken of the fact that whenever tires are replaced, they should also be balanced. Plaintiffs also contended that they are entitled to be compensated "for all necessary costs of . . . placing the TRUCKS in a condition to operate with replacement wheels," and since General Motors' first recall letter contained the statement that "[t]he way to avoid . . . danger is to purchase from your Chevrolet dealer the proper replacement wheels and, if necessary, *tires* and *springs* for your truck," then at least one of the necessary costs of "placing the TRUCKS *in a condition to operate* with replacement wheels" could be the cost of replacing the trucks' springs. Tires and springs and the weights for balancing are all property, and they are all property other than the defective product itself (the defective wheels).

As a consequence, I disagree with the majority's determination that plaintiffs have not alleged "physical damage." I believe that the rule of *Seely* compels a finding that plaintiffs have alleged physical damage to their wheels, to their tires, and to their springs. I therefore believe that plaintiffs have stated causes of action in both negligence (*Connor* v. *Great Western,* 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224][5] [financial institution had duty to prevent defective construction of homes that were being built with its capital]; *Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639 [55 Cal.Rptr. 94] [manufacturer had duty to prevent defect that caused automobile engine to catch afire]; see also *Sabella* v. *Wisler,* 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889], *Stewart* v. *Cox,* 55 Cal.2d 857 [13 Cal.Rptr. 521, 362 P.2d 345]) and products liability (*Kriegler* v. *Eichler Homes, Inc.,* 269 Cal.App.2d 224 [74 Cal.Rptr. 749] [contractor liable for damages resulting from a defectively constructed home]; *Gherna* v. *Ford Motor Co., supra*), and that plaintiffs should be allowed to prove their replacement property damage[6] (*Merchant etc. Assn.*

[5]The rule announced in *Connor, supra,* was later abrogated by the enactment of Civil Code section 3434.

[6]At least some of the plaintiffs to this action have already had their wheels replaced at General Motors' expense; this, of course, does not prevent these plaintiffs from stating an action for the loss of use and any of the other damages suffered as the proximate result of the physical injuries.

In addition, the fact that the representative plaintiffs have already received cost free replacement does not prevent their asserting the replacement damage of those plaintiffs who have not yet been partially recompensed. In *LaSala* v. *American Savings & Loan Assn.,* 5 Cal.3d 864, 868 [97 Cal.Rptr. 849, 489 P.2d 1113], the California Supreme Court wrote that "whenever the dismissal of a class action stems from a defendant's grant of benefits to the representative plaintiffs, which are not provided to the class as a whole, the court may not dismiss the action without notice to the class." In the case before us, Kelsey-Hayes has made no offer of any kind, and, in addition, Kelsey-Hayes stated in a reply memorandum filed June 29, 1970: "Kelsey-Hayes' position is legally quite distinct from that of its codefendant [General Motors]."

v. *Kellogg E. & D. Co.*, 28 Cal.2d 594, 600-601 [170 P.2d 923]) and their loss of use property damage[7] (*Reynolds* v. *Bank of America*, 53 Cal.2d 49 [345 P.2d 926, 73 A.L.R.2d 716]; *Pfingsten* v. *Westenhaver*, 39 Cal.2d 12 [244 P.2d 395]).

In regard to plaintiffs' demand for depreciation damages, however, in the event that plaintiffs ultimately recover their replacement and loss of use damages, plaintiffs' trucks will have been restored to the same utility value that the trucks would have had had the wheels not been defective, and, as a matter of law, there could be no recoverable depreciation damages.

I would reverse the judgment (order).

A petition for a rehearing was denied June 7, 1972. Stephens, J., was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied July 5, 1972. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.

---

As a consequence, I do not believe that the offer of General Motors has any bearing as to a class action as stated against Kelsey-Hayes. (See also *Echavarria* v. *Justice Court*, 21 Cal.App.3d 889 [99 Cal.Rptr. 98].)

[7] " 'The value of an article to its owner, as Sedgwick [on Damages (9th ed.) § 243a] points out, lies in his right to use, enjoy, and dispose of it. These are the rights of property which ownership vests in him. . . .' [*Cook* v. *Packard Motor Car Co.*, 88 Conn. 590 [92 A. 413].]" (*Holmes* v. *Raffo* (1962) 60 Wn.2d 421 [374 P.2d 536, 541].)