**S. M. WILSON & COMPANY,**
Plaintiff-Appellant,

v.

**SMITH INTERNATIONAL, INC.,**
Defendant-Appellee.

No. 75–2936.

United States Court of Appeals,
Ninth Circuit.

Dec. 19, 1978.

Robert B. Flaig, Thelen, Marrin, Johnson & Bridges, Los Angeles, Cal., for plaintiff-appellant.

Richard F. Oetting, Gilbert D. Jensen, Voegelin & Barton, Los Angeles, Cal., for defendant-appellee.

Before WALLACE and SNEED, Circuit Judges, and ENRIGHT,* District Judge.

SNEED, Circuit Judge:

This case presents the familiar question of the circumstances under which a seller in a commercial sale can limit its liability through contractual exclusions of warranty and remedy.

The district court found that the contract involved here was effective in excluding the buyer's recovery of consequential damages and granted summary or final judgment for defendant Smith International, Inc., on all claims. Our jurisdiction is based on 28 U.S.C. §§ 1291 and 1294. For reasons set out hereafter we affirm.

I.

*Facts.*

To understand this case it is necessary to set out the facts, including a description of the contract between the seller and buyer, and to describe in some detail the procedural state in which this case reaches us. We begin by characterizing the sales contract as one between parties who dealt in a commercial setting from positions of relatively

* Hon. William B. Enright, United States District Judge for the Central District of California, sitting by designation.

equal bargaining strength and who bargained and negotiated concerning the specifications of the product being sold and the risks of loss arising from any of its defects. *Cf. Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 748, 127 Cal.Rptr. 838, 845 (1976) (doctrine of products liability inapplicable on these facts). The buyer is not "a single inexperienced individual" dealing with a large corporate seller vending a standard product to the general public by means of a standard form, the "fine print" of which purports to relieve the seller of all meaningful liability. *Cf. Delta Air Lines, Inc. v. Douglas Aircraft Co.*, 238 Cal.App.2d 95, 102, 47 Cal.Rptr. 518, 523 (1965) (exculpatory clause did not result from inequality of bargaining power). More particularly, the contract involves the purchase of a tunnel boring machine by McGuire Shaft & Tunnel Corporation, a predecessor of appellant S. M. Wilson & Company,[1] from the Calweld Division of appellee Smith International, Inc. Wil-

son is a Delaware corporation, Smith a California corporation.

In 1971 Wilson contracted to construct a mine shaft in Kennsburg, Illinois, for the Ayrshire Coal Company, a division of American Metal Climax, Inc. To assist in performing that contract, Wilson began negotiations with Smith for the purchase of a tunnel boring machine. In due course Wilson agreed to pay $550,000 for a "Calweld 17'–0" diameter, 600 H.P. rock tunnel boring machine," which Smith agreed to design, build and deliver.

The documents which reflect this agreement are as follows. Smith sent Wilson an April 9, 1971, quotation and an April 16, 1971, revised quotation consisting of virtually the same documents. In these Smith attempted to limit its warranty on the machine and the scope of its liability. The applicable provisions are set out in the margin.[2] In brief, these provisions warranted

---

1. In 1974 McGuire merged into Wilson. Wilson was then substituted as plaintiff in the present action. For simplicity, both shall be referred to as "Wilson." Similarly, both Smith International, Inc., and its Calweld Division shall be referred to as "Smith."

2. *WARRANTY:*
Calweld warrants the Calweld Machine ("machine") described in the specifications incorporated in this contract to be free from defects in material and workmanship under normal use and service for which it was intended if, but only if, it has been properly installed and operated. Calweld's obligation under this warranty is limited to replacing or repairing, free of charge, F.O.B. point of manufacture, any defective part or parts of the machine that were manufactured by Calweld which are returned to Calweld at Santa Fe Springs, California, provided that such part, or parts, are returned to the Calweld factory not later than ninety (90) days after commencement of drilling operations using the machine. Parts such as engines, pumps, valves, electric motors, bearings, chains, etc., furnished by Calweld, but not manufactured by Calweld, will carry only the warranty of the manufacturer. Transportation charges or duties shall be borne by Purchaser. This shall be the limit of Calweld's liability for any breach of warranty. Purchaser must notify Calweld by registered mail or certified mail, return receipt requested, of a breach of warranty within thirty (30) days after discovery thereof, but not later than the guarantee period; otherwise, such claims shall be deemed

waived. No allowance will be granted for any repairs or alterations made by Purchaser without Calweld's prior written consent.

Calweld does not warrant this machine to meet the requirements of any safety code of any state, municipality, or other jurisdiction, and Purchaser assumes all risk and liability whatsoever resulting from the use thereof, whether used singly or in combination with other machines or apparatus.

This warranty shall not apply to any Calweld machine, or parts thereof, which has eeen (sic) repaired or altered, without Calweld's written consent, outside Calweld's factory or altered in any way so as, in the judgement of Calweld, to affect adversely the stability or reliability of the Calweld machine, or has been subject to misuse, negligence, or accident, or has not been operated in accordance with Calweld's printed instructions or has been operated under conditions more severe than, or otherwise exceeding, those set forth in the specifications for such machine.

THIS WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE NOT SET FORTH IN A WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF CALWELD. Calweld shall not be liable for any loss or damage resulting, directly or indirectly, from the use or loss of use of the machine. Without limiting the generality of the foregoing this exclusion from liability embraces the purchas-

that the machine would be free from defects in material and workmanship. That warranty was established "expressly in lieu of all other warranties, express or implied . . . not set forth in a writing signed by an authorized representative of Calweld [Smith]." This disclaimer was set forth in capital letters. Smith limited its liability for any breach of warranty to repair or replacement of defective parts. It generally excluded any liability resulting from the use or loss of use of the machine as well as for certain specific instances of such injuries. The proposal also contained a merger clause.

Smith's documents also provided that the contract was to be interpreted in accordance with California law. In addition, Smith agreed to "provide one competent tunnel boring machine specialist free of charge, to supervise installation, to demonstrate initial operation, and train customer's operator, for a period of 30 working days." This provision appears in a paragraph captioned "Installation Personnel" and follows one captioned "Shipping and Installation"

which provides in part: "Labor and the use of machinery to complete the erection of the machine will be provided by the Purchaser. Calweld is to provide supervision of erection as outlined under 'Installation Personnel.'" These two provisions are set forth in the margin.[3] Attached to the April 9 quotation was a cover letter signed by Brickle, a Smith employee, which estimated that the machine would bore at an approximate rate of 2.5 feet per hour through the hardest material expected to be encountered in the Ayrshire project.

On April 22, 1971, Wilson accepted the proposal by mailing Smith its purchase order. The reverse side of Wilson's purchase order, however, contained a printed liability provision[4] substantially different from that in Smith's proposal. This conflict was resolved by an April 28, 1971, letter in which Smith's vice president for administration objected to the Wilson liability provision and reiterated the terms of Smith's proposal. Wilson, by signing an acceptance of Smith's April 28 letter, acceded to Smith's

er's expenses for downtime or for making up downtime, damages for which the purchaser may be liable to other persons, damages to property, and injury to or death of any persons. Calweld neither assumes nor authorizes any person to assume for it any other liability in connection with the sale or use of the Calweld machine, and there are no oral agreements or warranties collateral to or affecting this agreement.

(b) The warranty hereinabove set forth shall not be deemed to cover maintenance parts, including, but not limited to, hydraulic oil, filters, teeth, cutters, and belting or chain for conveyors, for which Calweld shall have no responsibility or liability whatsoever.

(c) Notwithstanding the generality of the foregoing provisions of paragraph 11, Calweld's officers, its chief engineer, or any field engineer may agree in writing on behalf of Calweld to repair or replace any part the cost of which does not exceed $500. Unless such affirmation or promise is made in writing by an authorized employee of Calweld as hereinabove set forth, it shall not be enforceable against Calweld. No such agreement to replace or repair shall constitute an admission by Calweld of any legal responsibility to effect such replacement, to make such repair, or otherwise.

3. The complete text of these provisions is as follows:

SHIPPING AND INSTALLATION:

The machine will be delivered to the purchaser F.O.B. Calweld Plant, Santa Fe Springs, disassembled if necessary in component units suitable for shipment. Shipment from Calweld Plant, Santa Fe Springs, to job site will be made at the cost and risk of the Purchaser. Labor and the use of machinery to complete the erection of the machine will be provided by the Purchaser. Calweld is to provide supervision of erection as outlined under "Installation Personnel".

INSTALLATION PERSONNEL:

Calweld will provide one competent tunnel boring machine specialist free of charge, to supervise installation, to demonstrate initial operation, and train customer's operator, for a period of 30 working days.

** After the initial installation period, Calweld at its option will provide service personnel to supervise maintenance and cutter changes.

** The periods for determining rebuilding and replacing cutters will solely be determined by Calweld.

4. "You shall indemnify and save us harmless from any and all liability, expenses, costs damages, and/or losses of any kind arising out of injuries to any person or persons (including death) or damage to any property of any kind in connection with your performance hereunder."

original terms as to liability as expressed in its April 16 quotation.

Consistent with the terms of the contract Smith constructed the machine at its California plant, then disassembled it into component parts for shipment to the Illinois mine site. It was reassembled in Illinois by Wilson's employees under the direction of a supervisor provided by Smith.

The machine did not perform as expected. Wilson alleges that it bored at a rate slower than the expected 2.5 feet per hour, overheated, broke down, and wore out blades faster than had been projected. Smith's representatives visited the mine site but were unable to correct the machine's problems. Owing at least in part to problems with the machine, the Ayrshire project required 210 days to complete, rather than an expected 80 days. Near the completion of the project, Wilson's employees discovered that the machine's thrust rollers had been installed in a reverse position. The thrust rollers are a major link in the delivery of turning pressure to the machine's cutting wheel. Wilson contends that the backward installation of the thrust rollers was a major cause of the machine's poor performance and that such installation had taken place during the machine's reassembly in Illinois under the direction of Smith's supervisor. Smith not only attempted to discover the source of the machine's difficulties but also provided replacement thrust rollers as well as other replacement parts as requested by Wilson.

Problems with the machine continued even after it was removed from the completed Ayrshire project, repaired, and located at a project undertaken by Wilson at United States Steel's Dilworth mine in Pennsylvania. There it was discovered that one of 10 Staffa hydraulic motors was operating in opposition to the other nine because of the reversal of an internal valve in the motor. The Staffa motors had been installed in the machine in factory-built condition.

Wilson alleges that the difficulties with the Calweld machine caused it losses of approximately $1,844,559. It brought the present suit on November 29, 1972, in the United States District Court for the Eastern District of Illinois. Upon Smith's motion, the action was transferred on May 29, 1974, to the Central District of California.

Wilson lists eight causes of action. They are breach of contract for failure to reassemble the machine properly (first cause of action), breach of contract for failure to provide a competent installer (second cause), breach of implied warranty of fitness (third cause), negligence in design, construction, reassembly, and in failure to provide a competent reassembly supervisor (causes four through seven), and misrepresentation as to the machine's boring rate (eighth cause).

The district court held that Wilson could recover on none of its causes of action. This was done in two orders, the first dated March 21, 1975, and the second July 18, 1975. In the first, nine findings of fact appear and these are set forth in the margin.[5] Seven conclusions of law follow

---

5. "The Motion for Summary Judgment of defendant Smith International, Inc. came on for hearing before the United States District Court for the Central District of California, the Honorable Manuel L. Real, Judge Presiding, and counsel for the plaintiff McGuire Shaft & Tunnel Corp. and defendant Smith International, Inc. having argued the matter, and testimony having been taken, and documentary evidence having been submitted, the Court makes its Findings as follows:

FINDINGS OF FACT

1. Plaintiff McGuire Shaft & Tunnel Corp. is an Arkansas corporation whose principal place of business is not in the State of California.

2. Defendant Smith International, Inc. is a corporation organized and existing by virtue of the laws of the State of California, with its principal place of business in the State of California.

3. On or about April 28, 1971, McGuire Shaft & Tunnel Corp. and Smith International, Inc. entered into a written contract (hereinafter referred to as "Contract") for the purchase and sale of a Calweld 17 foot 0 inch diameter tunnel boring machine.

4. The Contract expressly provided that the transaction would not give rise to an implied warranty of fitness for a particular purpose.

5. The Contract expressly provided that Calweld's agents, employees and representa-

which are also set forth in the margin. The effect of these findings and conclusions was to dismiss causes of action three through eight. A separate order granting summary judgment to Smith on these causes was entered on the same day, March 21, 1975.

The July 18, 1975, order was predicated on a stipulation in open court by counsel for Wilson that it had suffered by reason of the machine's defects "no damages other than consequential damages." Record, vol. 3, at 688. The court excluded evidence of such

tives (other than Calweld's officers and/or its chief engineer) had no authority to make representations that would be binding on Calweld.

6. The Contract expressly provided that oral or written representations made prior to the execution of the contract were superceded (sic) by the contract itself.

7. The Contract expressly provided that the tunnel boring machine would be delivered disassembled if it was necessary for shipment.

8. The tunnel boring machine was delivered to McGuire Shaft & Tunnel Corp. at Calweld's plant disassembled and ready for shipment.

9. The Contract provided that Calweld would provide a tunnel boring machine specialist at the excavation site to supervise the erection (or assembly or installation) of the tunnel boring machine.

. . . .

12. Plaintiff has allegedly sustained only economic loss and has suffered no personal or property damage.

13. There were no warranties other than those contained in the Contract.

14. Plaintiff did not rely on any warranties or representations not set forth in writing.

CONCLUSIONS OF LAW

1. Jurisdiction is vested in this Court over the within action by virtue of the diversity of the parties.

2. Because the parties agreed that the transaction would not give rise to any implied warranty of fitness, a warranty of fitness will not be implied.

3. Defendant cannot be held liable on a theory of breach of implied warranty of fitness in view of the express disclaimer of such warranty in the Contract.

4. The Contract between McGuire Shaft & Tunnel Corp. and Smith International, Inc. included no representations other than those specified (sic) by the writings making up the contract.

5. The agents, employees and representatives of Smith International, Inc. had no authority to make representations concerning the tunnel boring machine that were not included in the contract.

. . . . .

damages with respect to the two remaining causes of action and granted final judgment thereon in favor of Smith. Contemporaneously with these actions Smith's counterclaims against Wilson in the amount of $123,000 for goods sold to Wilson were dismissed by stipulation by Smith's counsel "without prejudice."

The exclusion of evidence of consequential damages by the July 18, 1975, order, which is set forth in the margin, was based on several grounds.[6] The first was that

7. Defendant is not liable to plaintiff for negligence since plaintiff suffered only economic loss and not personal or property damage.

8. In view of the express provisions of the Contract plaintiff could not justifiably rely on any oral representations preceding the execution of the Contract."

6. "The Motion to Exclude Evidence came on for hearing on June 25, 1975 in the above-entitled Court, the Honorable Manuel L. Real, Judge Presiding, plaintiff having appeared by Thelen, Marrin, Johnson & Bridges by Robert B. Flaig and Kristian D. Whitten and Smith, Currie & Hancock by Thomas J. Kelleher, Jr. and defendant having appeared by Voegelin & Barton by Richard F. Oetting and Gilbert D. Jensen. The Court, after considering arguments of counsel, the Pretrial Statements and Order, the Briefs submitted by the parties, and the pleadings and papers on file herein, makes the following orders:

IT IS HEREBY ORDERED, that the motion to exclude evidence be granted as follows:

1. Evidence of any consequential damages resulting directly or indirectly from use or loss of use of the tunnel boring machine is hereby excluded on the following grounds:

(a) The plaintiff's alleged damages resulted from a breach of defendant's warranty that the machine would be free from defects in workmanship, and the parties' agreement provided that plaintiff's exclusive remedy for such defects would be the repair of the defects;

(b) The express agreement between the parties provided that the defendant would not be liable for any loss or damages resulting, directly or indirectly, from the use or loss of use of the machine;

2. Evidence of damages suffered by plaintiff as a direct or indirect result of alleged defects in Staffa motors is hereby excluded on the ground that the defective Staffa motor was not manufactured by defendant and the parties' agreement expressly provided that parts not manufactured by the defendant would carry only the warranty provided by their manufacturer.

3. Evidence of any damages resulting, directly or indirectly, from use or loss of use of

inasmuch as the consequential damages resulted from the breach of the warranty that the machine would be free from defects in workmanship, the remedy of repair provided the exclusive remedy. Moreover, consequential damage recovery was barred by the limitation of liability for losses resulting "from the use or loss of use" of the machine. Consequential damages resulting from the defects of the Staffa motor were not recoverable because under the contract only the warranty of the manufacturer exists. With respect to the motor Smith gave no warranty. Finally, any consequential damages resulting from use of the machine on the Dilworth project that might not be barred by these reasons were not recoverable because they were too remote and speculative. In its separate judgment of July 18, 1975, the district court, after reciting the stipulations of Wilson and Smith, gave judgment in favor of Smith on the remaining two causes of action.

Wilson in this appeal attacks both the March 21 and July 18 orders. This attack proceeds along four lines. The first is that the sales contract contains an express undertaking that the machine would be properly assembled by a competent tunnel boring machine specialist and that the machine when assembled would bore at a rate of 2.5 feet per hour. The second avenue of assault is that, inasmuch as the limited remedy of repair failed to achieve its essential purpose, the exclusion of all warranties other than that of freedom from defects in material and workmanship falls and, as a consequence, an implied warranty of fitness arises that was unfulfilled. Next, Wilson asserts that the limited remedy's failure to achieve its essential purpose destroys the sales contract's proscription against recovery of consequential damages and that, as a consequence, such damages are recoverable. Finally, he argues that in any event such damages are recoverable in negligence. We shall discuss each of these lines of attack.

## II.

### Were There Express Undertakings Other Than The Workmanship Warranty?

Only recently this court discussed Section 2–202 of Article II of the Uniform Commercial Code and its emphasis of the intent of the parties rather than "the integration practices of reasonable persons acting normally and naturally." *Interform Co. v. Mitchell*, 575 F.2d 1270, 1277 (9th Cir. 1978). This section appears in California as Section 2202, Commercial Code, and, as the pertinent California Code Comment indicates, represents a shift in California law from assuming that a writing was intended as a complete integration to assuming that it was not, "unless the court expressly so finds" that the parties so intended. We are confronted, as we were in *Interform Co.*, with a finding by the district court on this matter. While in *Interform Co.* the finding was that the parties did not intend an integration, here it is precisely to the contrary.

■ The contract between the parties provides that "[n]o agent, employee or representative of [Smith] other than [Smith's] officers and/or its chief engineer, has authority to bind [Smith] to any affirmation, representation, promise or warranty concerning the machine . . . ." Brickle, the signer of the April 9 letter containing representations of the machine's boring rate, was not an officer or chief engineer of Smith and therefore had no authority to make representations binding upon Smith. Consequently, Smith would not be bound by the representations unless they were ratified as part of the final written agreement between the parties. The district judge concluded that the parties did not contemplate the April 9 letter to be part of their agreement.

■ As in *Interform Co.*, we find that no error attaches to the district court's find-

---

the tunnel boring machine on the Dilworth Project is hereby excluded on the following grounds:

(a) Such damages were the result of alleged defects in the Staffa motor which was not manufactured nor warranted by the defendant;

(b) Such damages are remote and speculative and were not within the reasonable contemplation of the parties at the time the purchase agreement was executed."

ings. The representation of the boring rate contained in the April 9 cover letter does not appear in the document which Smith and Wilson intended as the final integration of their contract. In short, the trial judge found that the parties meant what they said in their contract, which stated that the writing superseded "all prior oral or written agreements or representations" and excluded all warranties "not set forth in a writing signed by an authorized representative of [Smith]." We cannot say that the trial judge was wrong; hence, there was no undertaking by Smith that the machine would bore at a rate of 2.5 feet per hour. It follows that the machine's failure to meet this standard is not actionable. The California case law authorities are consistent with these conclusions. *See Salyer Grain & Milling Co. v. Hensen*, 13 Cal.App.3d 493, 498, 91 Cal.Rptr. 847, 850 (1970); *Roberts v. Roberts*, 226 Cal.App.2d 507, 518, 38 Cal. Rptr. 176, 182 (1964).

Whether there exists an express undertaking to assemble properly the machine on Wilson's premises separate and apart from the warranty of freedom from defects in material and workmanship poses a problem of interpretation of the writing intended as the complete integration of the contract. *Interform Co.* once more instructs that under Section 2–202 of the Uniform Commercial Code the focus must be on the intention of the parties. 575 F.2d at 1277. The problem does not have an easy solution in this case.

It is obvious that Smith was obligated to deliver f.o.b. point of manufacture a machine which was capable of being shipped to the buyer. This meant it was required to be disassembled to some extent. It is also obvious that the parties intended the jobsite assembly to be done by labor and equipment furnished by the buyer under the supervision of "one competent tunnel boring machine specialist." The issue is whether the parties intended the workmanship warranty to embrace any defective performance by its "specialist" on the jobsite which results in an improperly assembled machine.

Wilson argues that no such intention exists because the workmanship warranty itself never became operative. Not being operative, the parties must have intended that the seller's jobsite assembly obligation stand independently of the warranty. This somewhat startling proposition rests on the conditional clause following the contract's statement of the workmanship warranty, *i. e.*, ". . . if, but only if, it has been properly installed and operated."[7] Because the machine was not properly assembled by Smith, the condition precedent to the existence of the workmanship warranty did not occur and the warranty never came into being.

This is a strained reading of the "if" clause. A more natural reading is that Smith sought to avoid liability for misassembly or faulty operation by Wilson's personnel when not under the control of Smith's supervisor. To interpret it as Wilson suggests would attribute to Smith a perverse desire to destroy the workmanship warranty, and undoubtedly all warranty limitations dependent thereon precisely at the point when it is needed by both seller and buyer, *viz.* at the point of its breach by the seller. Catch-22's must be explicit before accepted as the intention of the parties. The trial judge assumed the more natural reading was intended by the parties and we see no reason to differ.[8]

---

7. See n.2 *supra*, Warranty, first paragraph.

8. A similar, but more directly worded, provision appears in *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 449, 456 (E.D.Mich. 1972), *aff'd*, 509 F.2d 1043 (6th Cir. 1975). It is as follows:

 3. The Company's liability hereunder shall exist only if the machine is erected, started in operation and tested with the assistance of one of the Company's loaned employees, is erected in conformity with erection instructions, if any, furnished by the Company, has had normal use and service for the purpose for which it was designed, has not been subjected to misuse, negligence or accident and has not been altered or repaired by others than the Company in any respect which in the Company's judgment affects its condition or operation.

■ This returns us to the principal issue we now confront. Is there an undertaking to provide a competent specialist who will assemble the machine properly on the jobsite separate and apart from, and independent of, the workmanship warranty? The trial court after a full hearing supplemented by memoranda of authorities concluded that no such independent undertaking existed. Once more we cannot say he erred. He reasoned that had the allegedly faulty assembly occurred at the seller's plant it would have amounted to a breach of the workmanship warranty. This result should not be altered merely because the size of the machine requires that it be assembled on the buyer's premises. We cannot say that this misreads the intentions of the parties. As was said in *Lombard Corp. v. Quality Aluminum Products Co.*, 261 F.2d 336, 338 (6th Cir. 1958), "A defect in material is a defect in quality . . .. A defect in workmanship is a defect in the way some part of the machine is constructed." A defect in the way some part of the tunnel-boring machine is assembled also is a defect in workmanship.

The same can be said with respect to the Staffa hydraulic motors. Either they were improperly assembled by their manufacturer, in which case the contract requires that Wilson look to his warranties, if any, or the improper assembly is the consequence of a defect in workmanship.

■ In reaching these conclusions we are obviously influenced by the fact that this was a carefully negotiated contract in which the parties had the opportunity to spell out their obligations carefully. To assume an undertaking to assemble, standing outside all the careful restrictions drawn around the workmanship warranty and the exclusion of all other express or implied warranties, is to assume a level of cunning on the part of the buyer and incompetence on the part of the seller to which, in all other respects, neither party rose nor sank, as the case may be.

III.

*Effect of Inability To Repair.*

A. Statutory Background.

The contract we must construe, therefore, is one in which the seller warrants the machine to be free of defects in material and workmanship under normal use and service. All other warranties express or implied are disclaimed and the seller limits his liability to replacing or repairing, free of charge, "any defective part or parts of the machine" that the seller manufactured. In addition, the seller is not liable "for any loss or damage resulting, directly or indirectly, from the use or loss of use of the machine."

■ Wilson alleges that Smith's efforts to repair the machine were unsuccessful. Smith does not allege otherwise. The next issue which we must address is the effect, if any, of this inability to repair on Smith's disclaimers and liability limitations. It is this issue around which Wilson wages his crucial battle. If Smith's inability to repair demolishes his disclaimer and limited liability fortress, Wilson can invoke the implied warranty of fitness and dash to victory by recovering such consequential damages as permitted by section 2715, Cal.Com.Code (West 1964).

To understand the contest four sections of California's Commercial Code must be grasped, *viz.* §§ 2316, 2714, 2715 and 2719. Each is set out in the margin.[9] Section 2316 permits the exclusion of a warranty of

The purpose is clear—to exclude seller's liability should the buyer misinstall or misuse the machine.

**9.** Section 2316 Cal.Com.Code:

*Exclusion or Modification of Warranties.* (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence (Section 2202) negation or limitation is inoperatve (sic) to the extent that such construction is unreasonable.

(2) Subject to subdivision (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to

fitness provided it is in writing and conspicuous, as well as the limitation of remedies for breach of warranty. The exclusion of all other warranties in this contract is conspicuous [10] and, of course, is in writing. Thus, section 2316 does not alter the contract we have held the parties intended to make. Section 2714 merely sets forth the measure of damages a buyer is entitled to recover when the goods do not conform to the terms of the contract. The measure provided for breach of warranty "is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . . ." Consequential damages may also be recovered in a proper case. Section 2715 defines incidental and consequential damages, the latter including "[a]ny loss resulting from . . . particular requirements . . . of which the seller at the time of contracting had reason to know . . . ."

Section 2719(1)(a) permits the seller to limit the remedy available to a buyer "to

exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subdivision (2)

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this division on liquidation or limitation of damages and on contractual modification of remedy (Sections 2718 and 2719).

Section 2714 Cal.Com.Code:

*Buyer's Damages for Breach in Regard to Accepted Goods.* (1) Where the buyer has accepted goods and given notification (subdivision (3) of Section 2607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Section 2715 Cal.Com.Code:

*Buyer's Incidental and Consequential Damages.* (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

Section 2719 Cal.Com.Code:

*Contractual Modification or Limitation of Remedy.* (1) Subject to the provisions of subdivisions (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of *nonconforming* goods or parts; and

(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable.

10. See n.2 *supra.*

repair and replacement of nonconforming goods or parts"; but section 2719(2) permits the buyer the remedies "provided in this code" in those instances "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." Section 2719(3) permits the exclusion of recovery of consequential damages unless the exclusion is unconscionable.

### B. Presence of an Implied Warranty.

This sketch of the applicable code provisions makes plain that Wilson's attack must consist primarily of invoking either section 2719(2) or (3). In fact, he invokes only 2719(2); no argument is made that the exclusion of consequential damages is unconscionable. He asserts that because Smith was unable to repair the machine the limited remedy of repair failed "of its essential purpose." Such failure, he argues, opens up the remedies available under the Code, including the recovery of consequential damages, and eliminates the disclaimer of implied warranties, making available an implied warranty of fitness. He relies primarily on a line of cases commencing with *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970)[11] and including *Soo Line R. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977) (Minnesota law); *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir. 1971) (Alabama law); *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973) (Delaware law); *Koehring Co. v. A. P. I., Inc.*, 369 F.Supp. 882 (E.D.Mich.1974) (Michigan law); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (N.D.Ill.1970) (Pennsylvania law).

This is an impressive array of authorities. However, Wilson overstates their reach. *Adams*, the common ancestor of them all, did not sweep away entirely the disclaimer of implied warranties upon concluding that the limited remedy of repair had failed of its essential purpose. Such failure raised

an implied warranty of "reasonably prompt and timely repairs" notwithstanding a disclaimer, but the existence of an implied warranty "that the tractor [the article sold] was a good, satisfactory tractor capable of doing the work for which it was sold" was prevented by the disclaimer. Hence we do not regard these cases as holding that such failure wipes from the contract entirely a disclaimer of express or implied warranties. They do, however, preclude the existence of an implied warranty of fitness.

### C. The Bar to Recovery of Consequential Damages.

This family of cases, however, supports unanimously the proposition that such failure does remove from the contract the bar to the recovery of consequential damages. Against this array Smith relies primarily on *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D. N.Y.1976) (Pennsylvania and New York law); *Potomac Electric Power Co. v. Westinghouse Electric Corp.*, 385 F.Supp. 572 (D.D.C.1974), *rev'd mem. and remanded*, 174 U.S.App.D.C. 70, 527 F.2d 853 (1975) (Pennsylvania law); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300 (S.D.N.Y.), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971) (Ohio law). In these cases the clause barring recovery of consequential damages survived the failure of the repair remedy in its essential purpose. *See also U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 449 (E.D. Mich.1972), *aff'd*, 509 F.2d 1043 (6th Cir. 1975) (Pennsylvania law).

■ Prior to determining which line of cases should govern our disposition of this case it is necessary to decide whether the repair remedy failed of its essential purpose. Our consideration of this issue has been considerably aided by Eddy, *On the*

---

11. *Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 510 S.W.2d 555 (1974); *J. A. Jones Construction Co. v. City of Dover*, 372 A.2d 540 (Del.Super.Ct.), *appeal dismissed*, 377 A.2d 1 (Del.Super.1977); *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56 Haw. 466,

540 P.2d 978 (1975); *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn.1977); *Ehlers v. Chrysler Motor Corp.*, —— S.D. ——, 226 N.W.2d 157 (1975); *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 265 N.W.2d 513 (1978).

*"Essential" Purposes of Limited Remedies: The Metaphysics of U.C.C. Section 2–719(2)*, 65 *Calif.L.Rev.* 28 (1977). Of particular importance is the following passage:

> This rosy picture of the limited repair warranty, however, rests upon at least three assumptions: that the warrantor will diligently make repairs, that such repairs will indeed "cure" the defects, and that consequential loss in the interim will be negligible. So long as these assumptions hold true, the limited remedy appears to operate fairly and, as noted above, will usually withstand contentions of "unconscionability." But when one of these assumptions proves false in a particular case, the purchaser may find that the substantial benefit of the bargain has been lost.

*Id.* at 63.

Two of the assumptions suggested by Eddy allegedly have proven false in this case. The repairs did not "cure" the defects and consequential damages are not negligible. However, the warrantor did attempt to repair the machine but was unable to do so. As a result, the buyer lost a substantial benefit of his bargain despite the seller's efforts to provide the limited remedy. We do not weigh the alleged magnitude of consequential damages in determining whether the limited repair remedy failed of its essential purpose, because of the presence of the contractual exclusion of any liability for consequential damages. *See* Eddy, *supra*, 65 *Calif.L.Rev.* at 82–83. In any event, the inability to cure substantial defects does indicate that the repair remedy so failed. We know of no California authority that requires a contrary view; we, therefore, so hold.

■ The failure of the limited repair warranty to achieve its essential purpose makes available, as indicated above, the remedies as "may be had as provided in this code." This does not mean, however, that the bar to recovery of consequential damages should be eliminated. *See* Eddy, *supra*, 65 *Calif.L.Rev.* at 87. Wilson, under ordinary circumstances, should be entitled to recover the monetary equivalent of the benefit of his bargain, a recovery precisely described by section 2714(2), *Cal.Com.Code* (West 1964). That is, a purchaser, upon failure of the limited repair remedy to serve its essential purpose, is entitled to recover the difference between the value of what he should have received and the value of what he got. Wilson, however, has stipulated that he suffered no damages other than consequential. Whatever the reasons for this stipulation, we are confident that it cannot be used to argue that unless consequential damages are allowed no remedy exists to compensate Wilson for Smith's failure to perform. A remedy under section 2714(2) did exist which Wilson chose not to assert. We need not, therefore, reverse and remand to permit Wilson to recover this sum, a course of action we would adopt but for the stipulation.

■ The issue remains whether the failure of the limited repair remedy to serve its purpose requires permitting the recovery of consequential damages as sections 2714(3) and 2715 permit. We hold it does not. In reaching this conclusion we are influenced heavily by the characteristics of the contract between Smith and Wilson set forth in Part I of this opinion. Parties of relatively equal bargaining power negotiated an allocation of their risks of loss. Consequential damages were assigned to the buyer, Wilson. The machine was a complex piece of equipment designed for the buyer's purposes. The seller Smith did not ignore his obligation to repair; he simply was unable to perform it. This is not enough to require that the seller absorb losses the buyer plainly agreed to bear. Risk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated. The default of the seller is not so total and fundamental as to require that its consequential damage limitation be expunged from the contract.

■ Our holding is based upon the facts of this case as revealed by the pleadings and record and is not intended to establish that a consequential damage bar always

survives a failure of the limited repair remedy to serve its essential purpose. Each case must stand on its own facts. For this reason, although we find encouragement in cases relied upon by Smith, as well as the recent decision in *Lincoln Pulp & Paper Co. v. Dravo Corp.*, 436 F.Supp. 262 (D.Me.1977) (Pennsylvania law), we decline to treat any of them as precisely in point. Supportive California authority consists of *Delta Air Lines, Inc. v. Douglas Aircraft Co.*, 238 Cal. App.2d 95, 104–05, 47 Cal.Rptr. 518, 524 (1965) (between parties of equal bargaining strength, risk of loss for defective product should be borne by buyer who, as a matter of business judgment, accepted risk associated with bargained-for price; rather than on seller, who neither agreed to bear loss nor was compensated for it).

## IV.

### Recovery Under Negligence Counts.

 Where the suit is between a non-performing seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code. *See* Keeton, *Torts, Annual Survey of Texas Law*, 25 Sw.L.J. 1, 5 (1971); Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases*, 18 Stan.L.Rev. 974, 996–97, 1012–14 (1966). To treat such a breach as an accident is to confuse disappointment with disaster. Whether the complaint is cast in terms of strict liability in tort or negligence should make no difference. There exists some authority supporting this view. *See Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex.1978); *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal. App.3d 737, 127 Cal.Rptr. 838 (1976). In a somewhat curious way California law achieves this result by limiting the type of losses recoverable under an action in negligence. Economic losses are not recoverable under negligence. *Seely v.*

*White Motor Co.*, 63 Cal.2d 9, 18, 45 Cal. Rptr. 17, 23, 403 P.2d 145, 151 (1965) fixed the rule and it frequently has been followed. *See Anthony v. Kelsey-Hayes Co.*, 25 Cal.App.3d 442, 446–47, 102 Cal.Rptr. 113, 115–16 (1972); *Arizona v. Cook Paint & Varnish Co.*, 391 F.Supp. 962, 971–72 (D.Ariz.1975), *aff'd*, 541 F.2d 226 (9th Cir. 1976), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977). Although the rule is not universally applied, see *Union Oil Co. v. Oppen*, 501 F.2d 558, 565–67 (9th Cir. 1974), its application in this case by the district court, in conclusion of law number 7 of its March 21, 1975, order, was proper. *See* n.5, *supra*. It serves to limit the parties' rights to those provided by the Uniform Commercial Code, a body of law specifically designed to deal with commercial disputes between sellers and buyers of goods. Therefore, counts four through seven, being based on negligent performance of the contract were properly dismissed.

This conclusion makes it unnecessary to determine whether under California law there exists in this case "a breach of a duty growing out of contract" as opposed to the "breach of a promise set forth in the contract." According to *Eads v. Marks*, 39 Cal.2d 807, 810–11, 249 P.2d 257, 260 (1952), only the former gives rise to an action *ex delicto*. *Cf. W. Prosser, Handbook of the Law of Torts*, § 130 at 952 (4th ed. 1971) (discussion of interference with prospective advantage). Finally, our holding also makes it unnecessary to consider whether under California law the contractual bar to recovery of consequential damages also operates to absolve Smith of liability for negligence.

AFFIRMED.

ENRIGHT, District Judge, sitting by designation, dissenting:

I respectfully dissent. The threshold question presented in this case is whether the parties intended the limited express warranty, with its disclaimer of liability for consequential damages, to govern Smith's obligation to provide "one competent tunnel

boring machine specialist . . . to supervise installation."[1] The view adhered to by the majority is that the limited express warranty, with its accompanying disclaimer of liability for consequential damages, nullifies any right to recover consequential damages which Wilson might have absent this provision. My view is that the contract, when read as a whole, fails to manifest any intention of the parties to subject the "Installation Personnel" provision to the burdens, benefits and limitations of the limited express warranty. Accordingly, I conclude that the warranty's exclusion of consequential damages does not apply to the covenant to provide a competent tunnel boring machine specialist and that the remedy of consequential damages, pursuant to California Commercial Code section 2715, is available to redress Smith's breach of this covenant.

Under the terms of the contract at issue here, Smith delivered a disassembled tunnel boring machine to Wilson, free on board Smith's plant, at a purchase price of $550,-000. Shipment from Smith's plant to the jobsite was at the risk of Wilson; labor and use of equipment to "install"[2] the machine was provided by Wilson. However, Smith's covenant to furnish "one competent tunnel boring machine specialist free of charge, to supervise installation . . ." makes it clear that Smith bore the responsibility of properly installing the machine.

The specialist furnished by Smith proved to be incompetent. Under his supervision and guidance the thrust rollers of the machine were installed backward. Additionally, one of the machine's ten Staffa motors was installed in such a manner that it rotated backward (while the other nine motors rotated forward). A considerable period of time elapsed before these defects were discovered and rectified. As a result of these incorrect orientations the machine performed inefficiently and inadequately, resulting in large-scale consequential damages to Wilson.

It has long been recognized that all rules of interpretation of contracts are subordinate to the leading principle that the intention of the parties must prevail, unless inconsistent with some rule of law. *Chesapeake & Ohio Canal Co. v. Hill*, 82 U.S. (15 Wall.) 94, 100, 21 L.Ed. 64, 67 (1872); *General Casualty Co. v. Azteca Films, Inc.*, 278 F.2d 161, 167 (9th Cir.), *cert. denied*, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 896 (2d Cir. 1976). In determining the intention of the parties, a court must survey the contract as a whole and not merely focus on a specific provision or a fragmentary part. *California Pacific Bank v. Small Business Administration*, 557 F.2d 218, 223 (9th Cir. 1977); *General Casualty Co. v. Azteca Films, Inc., supra*, 278 F.2d at 167; *Makofsky v. Cunningham*, 576 F.2d 1223, 1230 (5th Cir. 1978); *AMP, Inc. v. United States*, 389 F.2d 448, 182 Ct.Cl. 86 (1968), *cert. denied*, 391 U.S. 964, 88 S.Ct. 2033, 20 L.Ed.2d 878 (1968).

Viewing the contract as a whole, it cannot be said that the parties intended the terms of the limited express warranty to apply to and control Smith's obligation to provide a competent tunnel boring machine specialist to supervise installation. The warranty given by Smith extends to all defects in "material" and "workmanship." Giving these words their natural and ordinary trade meanings, *Hanley v. James McHugh Constr. Co.*, 444 F.2d 1006, 1009 (7th Cir. 1971), it would appear that Smith's failure to provide a competent machine specialist cannot be characterized as either a defect in "material" or a defect in "workmanship."[3] In rebuttal it may perhaps be

1. *See* the "Installation Personnel" provision of the contract, set forth at footnote 3, majority opinion.

2. The contract characterizes assembly of the machine as "installation."

3. The meanings of the terms "material" and "workmanship" would appear to be relative, being dependent upon the stage of the production process at which a warranty is given. For example, a building construction company would regard a warped steel beam as a defect in "material," whereas the steel company which fabricated the beam would regard the defect as one of "workmanship."

urged that since the specialist's performance was defective, a defect in "workmanship" resulted. Should such an interpretation of the contract provision be accepted, however, a contradictory result follows. The machine is warranted to be free from "defects in material and workmanship . . if, but only if, it has been properly installed . . .." Assuming *arguendo* that the specialist's performance in installing the machine may be characterized as "workmanship," Smith would be warranting the machine free from a defect in installation "if, but only if," it had been properly installed. The law does not require an interpretation which renders the "if, but only if" caveat meaningless. An interpretation which gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, meaningless or achieves a whimsical result. *State of Arizona v. United States*, 575 F.2d 855, 863 (Ct.Cl.1978); *Texaco, Inc. v. Holsinger*, 336 F.2d 230, 235 (10th Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965). The untenable result which follows from a construction which places installation within the ambit of "workmanship" can best be avoided through a recognition that installation and "workmanship" are entirely distinct and mutually exclusive. This conclusion is buttressed by the juxtaposition of these terms in the body of the warranty. Their proximity to each other leads one to suppose that the draftsman meant one thing by installation and another by "workmanship."

The contract is clearly ambiguous with respect to whether the term "workmanship" comprehends the specialist's services in supervising installation. Under California law, all ambiguities in a contract are to be resolved against the draftsman. California Civil Code § 1654; *Nixdorf Computer, Inc. v. Jet Forwarding, Inc.*, 579 F.2d 1175, 1178 (9th Cir. 1978). Since Smith drafted the contract, the ambiguity surrounding the term "workmanship" should be resolved against it through a finding that "workmanship" does not embrace Smith's obligation to provide a competent tunnel boring machine specialist.

Wilson bargained for a tunnel boring machine in proper working order. It received a defectively assembled and poorly-working machine. According to the trial court's interpretation of the contract, Wilson's remedy for breach was limited by the terms of the limited express warranty to repair or replacement of defective parts. Since no part of the machine was defective (the malfunctioning being attributable to misassembly), the trial court's construction leaves Wilson remediless. Smith might just as well have provided no assembly specialist at all, furnishing merely a pile of unassembled parts. In that case Wilson would have been relegated to the completely ineffectual remedy of replacement and repair. Such a result would seem anomalous at best and is, in my opinion, in no way compelled by established principles of contract interpretation.

I concur in the majority's finding that recovery is precluded under the negligence counts in Wilson's complaint but would reverse the judgment of the trial court with respect to the contract counts.