HAWAIIAN TELEPHONE CO.,
Plaintiff-Appellee,

v.

MICROFORM DATA SYSTEMS, INC.,
Defendant-Appellant.

No. 86–2181.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1987.

Decided Oct. 9, 1987.

Craig H. Casebeer and Daniel Johnson, Jr., San Francisco, Cal., for plaintiff-appellee.

Richard E. Stifel, Honolulu, Hawaii, for defendant-appellant.

Before GOODWIN, BEEZER and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Microform Data Systems, Inc. ("MDS") appeals the district court's judgment in favor of Hawaiian Telephone Company ("HT") in HT's breach of contract action.

## FACTS AND PROCEEDINGS

In 1978, MDS, a California corporation, contracted with HT, a Hawaii public utility, to manufacture and install a computerized directory system. The contract provided that MDS would complete installation of the host computer by February 16, 1979, and specified fifteen dates for MDS to install operator, supervisory, and training positions, beginning February 16 and ending April 20, 1979. Failure to meet these installation dates would trigger a penalty. This penalty, which the parties agreed would not exceed $100,000, was to accrue at the rate of $1,000 for each day installation was delayed, and was to be discounted from the system's sales price. Additionally, if installation of the host computer by February 16, 1979 was "substantially delayed," MDS agreed to provide HT with an interim backup system that would be fully operational by May 19, 1979. After installation, HT had five business days to reject the equipment if the system did not perform according to specifications. The specifications required that: (1) the system be able to handle 15,000 calls per hour, while maintaining a response time of one sec-

ond;[1] (2) the system hardware and software be tested before shipping to demonstrate fourteen functional tasks;[2] (3) the system include "non-stop" hardware and software to ensure automatic recovery from any component failure; and (4) the system contain an HT data base which could be updated and loaded into the system's memory daily.

In January 1979, HT representatives traveled to the MDS facilities in California to inspect the hardware and to observe the system perform. During testing, it was apparent that the system was not functionally operational even though the contract required the system to be operating by December 1, 1978. Seven key functions could not be demonstrated satisfactorily.

In February, MDS informed HT that factory acceptance testing would be delayed five weeks and that software development was behind schedule. MDS missed the February 16 installation date and was notified by HT that the installation penalties had been triggered. MDS did not notify HT that it would install the backup, nor did it exercise any rights it had under the agreement to provide the interim backup system. On February 28, MDS informed HT that factory acceptance testing would begin March 26, eight weeks behind schedule. MDS' internal office memoranda indicated that it was still encountering serious problems with the system and that it did not have any feasible plans to solve these problems.

On April 6, 1979, HT representatives visited MDS and discovered that the system could not perform critical functions such as "non-stop" data base loading, multiple inquiry searching, and a one-second response time for business listings. The HT representatives concluded that MDS would require an additional nine to twelve months to bring the system up to specifications. On April 27, MDS informed HT that the system's software would not be completed

until September and that non-stop would not be included. MDS also proposed altering the system, adding hardware, and changing the data retrieval strategy. These proposed changes were unacceptable to HT.

By letter of May 8, 1979, HT notified MDS that it was canceling the contract because of serious development delays and MDS' elimination of critical performance functions. On June 8, MDS' president reported to the MDS board of directors that (1) the HT program was nine months or more behind schedule; (2) success in meeting specifications was "far from assured" even after an extended development period; and (3) MDS had accepted a cancellation of the contract from HT. Further MDS evaluations of the project indicated that it would take MDS one to two years and require at least three people working full time to bring the system up to specifications.

HT sued MDS for breach of contract in Hawaii state court on February 9, 1981. MDS removed the case on the basis of diversity to the United States District Court for the District of Hawaii. After a bench trial, the district court found that HT was entitled to cancel the agreement on May 8, 1979 because MDS had materially breached the agreement. The court concluded that under the provisions of the contract, HT had the right to give MDS notice of cancellation on May 8, 1979, or, in the alternative, HT did not need to give MDS prior notice of cancellation because by May 8, 1979, any obligation to give notice had been excused as a "useless act." The district court also concluded that: (1) the provision in the agreement excluding consequential damages never became effective because MDS never installed a system; (2) the warranties failed of their essential purpose; and (3) because the breach was so total and fundamental, the exclusion of

---

1. Response time refers to the time between the operator's last keystroke and the first listing displayed on the terminal.

2. These included, among others, the ability to have the data base loaded in accordance with the specifications, the ability to update the data base on an emergency basis, the ability to perform record-keeping functions, the ability to retrieve listings as specified, and the ability to meet the requirements with respect to response time.

consequential damages was unconscionable. The court entered judgment in favor of HT for $600,872, which included consequential damages of $295,982. The court also awarded HT $188,780 in attorney fees.

On appeal, MDS contends that the court erred (1) in finding MDS in breach of the agreement on May 8, 1979; (2) in concluding that HT could cancel the agreement without first complying with a contractual provision which required thirty days advance notice and an opportunity to cure; and (3) in awarding consequential damages. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## DISCUSSION

### A. *Standard of Review*

■ We review de novo the district court's interpretation of contractual provisions. *United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 869 (9th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987). We review the district court's factual findings for clear error. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous").

■ In this diversity case, we apply conflict-of-law principles of the forum state, Hawaii. *See, e.g., S.A. Empresa de Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir.1981). The contract provides that it shall be governed by California law. Under Hawaii law, "[w]hen the parties choose the law of a particular state to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied." *Airgo, Inc. v. Horizon Cargo Transport, Inc.*, 66 Haw.

590, 670 P.2d 1277, 1281 (1983). Thus, we apply California law to interpret the agreement.

### B. *Breach*

■ MDS argues that it did not breach the agreement on May 8, 1979 because the installation deadlines were indefinite. In essence, MDS argues that when HT agreed to accept price discounts as a penalty for delay, HT agreed to an indefinite time for performance. We disagree.

First, HT bargained for the installation of a computerized directory assistance system, not a $100,000 penalty/price discount. The penalty provisions were intended to compensate HT for initial installation delays; they were not included to permit MDS to delay installation indefinitely. It is clear that the parties contemplated ultimate performance by May 1979. The date set for installation of the final operator positions was April 20, 1979. Even the interim backup system, intended only as a last resort, was to be fully operational by May 17, 1979. The district court correctly determined that MDS' inability to deliver a working system, even after the maximum penalties accrued, constituted a material breach of the contract. We reject MDS' contention that it did not breach the contract because there was no final "drop dead" date for performance. The fact that the contract did not contain a final date for performance beyond the penalty period merely indicates that the parties contemplated performance, not breach. *See* O.W. Holmes, *The Common Law* 302 (1881) ("when people make contracts, they usually contemplate the performance rather than the breach").

■ MDS argues that HT waived its right to cancel the agreement by inducing MDS to continue work beyond the expiration of the penalty period.[3] The record

---

**3.** MDS's reliance on *KLT Industries, Inc. v. Eaton Corp.*, 505 F.Supp. 1072 (E.D.Mich.1981) to support its argument that HT waived an ultimate delivery date is misplaced. In *KLT Industries*, the purchaser, Eaton, never invoked the contractual penalty provisions or claimed the seller, KLT, breached when it failed to meet a

specific delivery date. Here, when MDS missed the first installment deadline, HT immediately invoked the penalty provisions. Further, the contract provided that if the system was not installed, MDS would provide a back-up system which would be operational by May 1979. MDS

shows that the penalties reached the $100,-000 maximum on April 10, 1979. Shortly thereafter, HT representatives visited MDS facilities in California to determine whether MDS could deliver an operational system within a reasonable time. When HT learned that the system would not be available for several months, it promptly sent MDS a letter of cancellation. HT did not waive its right to timely performance. It visited MDS in California to observe progress on the system, waited for MDS to bring the system up to specifications, attempted to assist MDS to perform, and, shortly after determining that MDS would be unable to complete the system as specified, notified MDS that it was canceling the agreement.

The record also supports the district court's conclusion that MDS breached the contract because it could not bring the system up to specifications. The system never passed the acceptance test set forth in the specifications. It was never able to handle 15,000 calls per hour, it never performed within the one-second response time for all listings, and it never included the non-stop function.

## C. *Cancellation*

■ MDS' next contention is that the district court erred in concluding that HT could cancel the agreement without first complying with a provision of the contract which required thirty days advance notice of termination. The Purchase Agreement provided that "[e]ither party may, by written notice to the other party, terminate this Agreement ... (b) [u]pon material failure of the other party to observe, keep or perform any of the other covenants, terms or conditions herein, if such default continues for thirty (30) days or more after written notice to such other party...." MDS ar-gues that the language is plain and unambiguous, requiring the party seeking termination to give written notice of default, and then if default is not cured within thirty days of that notice, to provide *further* written notice.

We do not agree with MDS' interpretation of this provision of the contract. Contrary to MDS' interpretation, the language may also be read, and we believe more reasonably, as providing that a party may give written notice of cancellation as soon as the other party breaches, with such cancellation becoming effective if the breach is not cured within thirty days. At most, the language is susceptible of two different interpretations, *see Castaneda v. Dura-Vent Corp.,* 648 F.2d 612, 619 (9th Cir. 1981). We construe this uncertainty against MDS, which drafted the contract. *See Heston v. Farmers Ins. Group,* 160 Cal.App.3d 402, 415, 206 Cal.Rptr. 585, 593 (1984). HT's May 8 letter was notice that it would cancel the agreement unless MDS performed within one month. This letter remained effective unless MDS cured its breach within thirty days. MDS' own post-May 8 evaluations establish that on May 8 the system was nowhere near completion, and that there was no possibility that MDS could meet the system specification requirements in any period short of nine months. When HT gave notice of cancellation on May 8, and MDS did not perform within thirty days, cancellation was effected.

## D. *Consequential Damages*

■ MDS' final argument is that the district court erred in awarding consequential damages because the contract contained a warranty provision excluding such damages.[4] In relying upon the exclusion of consequential damages and limitation of liability in the event of MDS' breach of the

___

provided neither system nor back-up, and HT promptly cancelled the contract.

4. This provision provides:

  7. *Warranty.* Microform warrants that the equipment, when delivered and installed, will conform to the Equipment Specifications attached hereto and will be in good working order. For sixty (60) days following the date of acceptance pursuant to paragraph 3 hereof, Microform warrants each item of equipment to be free from defects in material and workmanship.

  In the event any item of equipment does not perform as expressly warranted, Microform's sole obligation shall be to make necessary repairs, adjustments or replacements at no additional charge to Customer. Any major item of replacement equipment shall also be

repair warranties, however, MDS fundamentally misapprehends the nature of this case.

MDS argues that its failure to deliver a functional system is equivalent to a failure to remedy a defect in a delivered system. By failing to deliver the system at all, however, the repair warranties were never triggered. They did not become operative and could not limit remedies to which they applied under the contract. *See e.g., Twin City Fire Ins. Co. v. Philadelphia Life Ins. Co.*, 795 F.2d 1417, 1426 (9th Cir.1986) ("A manufacturer who promises to deliver a good and breaches that contractual obligation may not prevent the imposition of benefit of the bargain damages by arguing that he never agreed to accept liability for the failure to deliver the good. Liability for damages results not from the agreement to assume liability, but from the promise to deliver the good."). The limitation of liability for breach of the repair warranties was tied to the provision excluding consequential damages, and both were dependent on delivery of the system. This is not a case in which a delivered system failed to function as warranted. The system was never delivered at all.

It is this failure by MDS to develop and deliver the specified system which fundamentally distinguishes this case from *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363 (9th Cir.1978) upon which MDS relies. In *S.M. Wilson*, the buyer "agreed to pay $550,000 for a ... 'rock tunnel boring machine,' which [the seller] agreed to design, build and deliver." *Id.* at 1366. Consistent with the terms of the contract, the seller constructed the machine and delivered it, unassembled, to the agreed place. There it was assembled and put into operation. It

did not function as warranted, the seller attempted to fix it, but was unable to, and the buyer sued for consequential damages caused by the failure of the machine to operate as it should have. The district court concluded that the contract effectively excluded the buyer's recovery of consequential damages and granted summary judgment. We affirmed. The contract contained an express warranty that the machine would be free from defects in material and workmanship. The seller limited its liability for breach of this warranty to repair or replacement of defective parts. Liability for the consequential damages claimed by the buyer was expressly excluded by the contract. We concluded that although the limited repair remedy had failed of its essential purpose because of the seller's inability to cure substantial defects in the boring machine, this "default of the seller [was] not so total and fundamental as to require that [the contract's] consequential damage limitation be expunged from the contract." *Id.* at 1375.

Although we held in *S.M. Wilson* that the seller could take advantage of a contract's consequential damage limitation when the repair remedy had failed, we reached the opposite conclusion in *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir.1985). In *RRX Industries* we affirmed the trial court's award of consequential damages notwithstanding a provision in a computer software contract which limited the seller's liability to the contract price. The seller in *RRX Industries* completed installation of a computer software system for the buyer, but was unable to get the bugs out of the system or make it operate reliably. We noted that "the software never functioned as intended ...[, the

warranted for sixty (60) days from the date the replacement equipment was installed.

. . . . .

Microform warrants the software shipped with the System/C shall operate in accordance with the Specifications attached hereto for the useful life of said system. In the event the software does not perform as expressly warranted, Microform's sole obligation shall be to make necessary corrections at no additional charge to Customer.

. . . . .

THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EX-

PRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, AND ARE IN LIEU OF ALL OBLIGATIONS OR LIABILITIES ON THE PART OF MICROFORM FOR ANY CLAIMS, DAMAGES OR EXPENSES OF ANY KIND, WHETHER MADE OR SUFFERED BY CUSTOMER OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION CONSEQUENTIAL DAMAGES EVEN IF MICROFORM HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.

seller] failed to correct adequately programming errors ...[, and] did not provide [the buyer's] employees with sufficient training." *Id.* at 546. We held this evidence supported the trial court's finding of a breach of the contract and that the trial court properly found the default by the seller "so total and fundamental that its consequential damages limitation was expunged from the contract." *Id.* at 547 (citing *S.M. Wilson*).

In both *S.M. Wilson* and *RRX Industries,* there was a delivery of the subject matter of the contract. In both cases the seller attempted to make the product function properly, but failed. In *S.M. Wilson* we held that the failure of the repair remedy was not so total and fundamental as to require that the consequential damage limitation be expunged from the contract. In *RRX Industries,* however, we held that it was. In both cases we stated "[e]ach case must stand on its own facts." *RRX Industries,* 772 F.2d at 547; *S.M. Wilson,* 587 F.2d at 1376.

While the case presently before us arguably may be closer on its facts to *RRX Industries* than to *S.M. Wilson,* the breach in this case is more fundamental than in either of those two cases. In *RRX Industries,* the seller delivered the computer software program, but could not make it operate reliably. In *S.M. Wilson,* the seller delivered the boring machine, but similarly was unable to make it function as represented. In our case, no product was delivered.

The contractual provision at issue in this case purports to exclude liability for consequential damages when the equipment is "delivered and installed." The provision applies only to consequential damages sustained after a system conforming to contract specifications is in place, and it does not otherwise foreclose an award of consequential damages. *See Consolidated Data Terminals v. Applied Digital Data Systems, Inc.,* 708 F.2d 385, 392–93 (9th Cir. 1983) (contract provided that the seller would not be liable for any consequential damages arising in connection with the use of, or inability to use, the product; this limiting language did not exclude all consequential damages, but only such damages

as resulted from loss of use of defective equipment). Because this system was never installed, the limited repair remedy with its exclusion of consequential damages did not become applicable. Thus, although provision was made in the contract which purportedly excluded the recovery of consequential damages, this provision, being inextricably tied to the express warranties and limited repair remedy, did not preclude recovery of consequential damages for MDS' breach in failing to develop and deliver the system as contracted.

Having decided that the limited repair remedy and exclusion of consequential damages in the contract are inapplicable in this case because MDS never delivered the system, we do not reach the question whether the exclusion of consequential damages in the contract is unconscionable under Cal.Com.Code § 2719(3) (West 1987 Supp.). Nor need we decide whether there was a failure of the limited repair remedy which resulted in failure of the essential purpose of the contract under Cal.Com. Code § 2719(2) (West 1987 Supp.). Given the nature of the breach of contract in this case, these issues are not before us. *See Consolidated Data,* 708 F.2d at 393.

AFFIRMED.